Annie Lee **WHITFIELD** et al.,
Plaintiffs,

v.

**Ruben KING** et al., **Defendants.**
Civ. A. No. 3330–N.

United States District Court,
M. D. Alabama, N. D.

Aug. 8, 1973.

Frank P. Samford, III, and William M. Dawson, Jr., Tuscaloosa, Ala., and Judith S. Segal and Stan Downey, Birmingham, Ala., for plaintiffs.

William J. Baxley, Atty., State of Ala., and Clyde P. McLendon and Mary Lee Stapp, Jamie L. Pettigrew, Asst. Attys. Gen., State of Ala., for defendants.

Ira DeMent, U. S. Atty., and Kenneth E. Vines, Asst. U. S. Atty., M. D. Ala., Montgomery, Ala., for United States, amicus curiae.

Before GODBOLD, Circuit Judge, and JOHNSON and VARNER, District Judges.

GODBOLD, Circuit Judge:

The plaintiffs in this case have attacked on constitutional and statutory grounds alleged racial discrimination which they claim has been practiced by the Department of Pensions & Security of the State of Alabama in its administration of four programs known as categorical assistance programs. These programs are established by federal law and financed to a great extent with fed-

eral funds but administered by the states in what has been termed "a scheme of cooperative federalism." King v. Smith, 392 U.S. 309, 316, 88 S. Ct. 2128, 20 L.Ed.2d 1118, 1125 (1968). They provide financial assistance and rehabilitation services to needy persons who are disabled by physical impairments or old age or youth. The four programs are Aid to Needy Families with Dependent Children,[1] Aid for the Permanently and Totally Disabled,[2] Old Age Assistance[3] and Aid to the Blind.[4] The plaintiffs represent classes of Negro citizens residing in the State of Alabama and receiving benefits under the Dependent Children and the Aid for the Disabled programs who claim that because of their race they have lost their benefits or receive lower benefits.

This court has jurisdiction of the subject matter under 42 U.S.C. § 1983 and 28 U.S.C. § 1343. The State of Alabama and its officers who are named as defendants have appeared through the state Attorney General. Initially a request for a temporary restraining order was denied by District Judge Frank M. Johnson, acting as a single judge. Subsequently a three-judge district court was convened and the case set for hearing[5] and evidence taken. The parties and the United States, as amicus curiae, have filed extensive briefs.

Plaintiffs' suit was occasioned by the Department's adoption in 1971 of a new regulation,[6] effective as of May 1, 1971, and approved by the United States Department of Health, Education & Welfare. That regulation established, for only the Dependent Children and the Disabled programs, a new method of de-

termining eligibility and benefits for persons having "outside" or nonexempt income,[7] which resulted in decreased eligibility and benefits for recipients of assistance. In these two programs the higher percentage of beneficiaries are blacks. The new regulation did not affect, and left unchanged, the method for determining for like persons—that is recipients with "outside" income—eligibility and benefits under the Old Age program, where the higher percentage of beneficiaries are whites, and the Aid to the Blind program.[8]

To precisely understand plaintiffs' contentions requires examination of the methods by which benefits are calculated for the four categorical assistance programs. First, the Department must compute a "standard of need" composed of various essential living expenses[9] which are common to all recipients regardless of program categories. If the pool of available funds is insufficient to bring all recipients up to the standard of need the state may adjust downward the level of benefits it will pay by means of a reduction factor or factors. The reduction factor is simply a means by which the state can adjust need figures downward to a benefit level which its fiscal capacities can meet. The federal statutes do not require that the same reduction factor be employed for all programs, and the validity of this arrangement has been sustained in numerous cases. Prior to May 1, 1971 Alabama's reduction factor for the Dependent Children program was 35% and for the Disabled program 58%. Thus, assuming a family receiving Dependent Children benefits had a family need of $200 and

---

1. 42 U.S.C. § 601 et seq.

2. 42 U.S.C. § 1351 et seq.

3. 42 U.S.C. § 301 et seq.

4. 42 U.S.C. § 1201 et seq.

5. With the consent of all parties the case was heard and submitted for decision upon plaintiffs' request for a temporary injunction and on the merits as well.

6. Administrative Letter 2957, dated April 19, 1971.

7. Some "outside" income is "countable" in considering eligibility and benefits and some is not. The differences are not material to this case.

8. In this program the number of persons receiving aid is very small, and they are almost equally divided between the black and white races.

9. Such as food, clothing, shelter, household supplies, medical supplies.

no other source of funds, the family would receive 35% of $200, or $70. The Old Age and Aid to Blind programs were, however, not the subject of reduction factors, and recipients thereunder were paid at 100% of need.

Under the regulations in effect prior to May 1, 1973 the Department determined the benefits of a recipient of Dependent Children or Disabled assistance in the following manner. From the "standard of need" it deducted any "outside" nonexempt income received from sources other than the program. To this net figure it applied the reduction factor used for all persons in that program. Under the new regulation the Department first applied the reduction factor to the recipient's standard of need and then deducted the nonexempt income from the figure thus obtained. The consequence was that many recipients with some outside income suffered reduction or loss of benefits.[10]

Plaintiffs assert that the new method of calculation violates federal statutes, 42 U.S.C. § 602(a)(23), which requires each state to make certain cost of living adjustments to its standard of need, and 42 U.S.C. § 602(a)(10), which provides

that aid to families with dependent children "shall be furnished with reasonable promptness to all eligible individuals." We discuss below other claims of violations of federal statutes. Plaintiffs also claim that the defendants have violated the equal protection clause of the Fourteenth Amendment by the promulgation of the new regulation and by the widely disparate reduction factors for the various programs that were in effect when the new regulation was adopted and prior thereto. And they contend that adoption of the regulation without prior notice to those affected and opportunity for a "fair hearing" deprived them of procedural due process as required by Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Following hearing of this case, we withheld decision because the State of Texas had adopted the same new method for calculating benefits under its Dependent Children program, suit had been filed by Negroes and Mexican-Americans attacking the state's actions, a three-judge court had ruled, and an appeal was pending in the Supreme Court.[11] The three-judge court had held the amended method for calculating benefits

---

10. The effect may be demonstrated this way, assuming a person receiving benefits under the Disabled program, with a standard of need of $200 and outside nonexempt income of $100:

Old system:
$200 (need)
−100 (outside income)
$100 (unmet need)
x.58 (Aid for the Disabled reduction factor)
$ 58 (benefits payable)

New System:
$200 (need)
x.58 (Aid for the Disabled reduction factor)
$116 (reduced need)
−100 (outside income)
$ 16 (benefits payable)

See Jefferson v. Hackney, 406 U.S. 535, 539–540 n. 6, 92 S.Ct. 1724, 32 L.Ed.2d 285, 292 n. 6 (1972). Assuming a family qualified for Dependent Children benefits with a $200 need and $100 nonexempt income, it would receive:

Old System:
$200 (need)
−100 (outside income)
$100 (unmet need)
x.35 (Dependent Children reduction factor)
$ 35 (benefits payable)

New System:
$200 (need)
x.35 (Dependent Children reduction factor)
$ 70 (reduced need)
−100 (outside income)
−0− (benefits payable)

11. Jefferson v. Hackney, 304 F.Supp. 1332 (N.D.Texas 1969) (3-judges), vacated and remanded, 397 U.S. 821, 90 S.Ct. 1517, 25 L.Ed.2d 807 (1970). On remand a new judgment was entered without opinion (apparently unreported). It was the appeal from this second judgment which was pending when the instant case was heard.

violated § 602(a)(23). On the constitutional claim, which questioned the disparity between the reduction factors for the different programs, that court had held that the plaintiffs had not made a sufficient showing of racial or ethnic discrimination to prove a violation of the equal protection clause. Jefferson v. Hackney, 304 F.Supp. 1332 (N.D.Tex. 1969) (3-judges). The Supreme Court has rendered its decision, Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1973), and we consider the case before us in the light of the Supreme Court's conclusions and opinion.

### 1. The statutory claims

■ In *Jefferson* the Supreme Court concluded that the new method of calculation violates neither § 602(a)(23) nor § 602(a)(10). That decision is dispositive of those issues.

■ A related question raised by plaintiffs is whether the new regulation violates 42 U.S.C. §§ 1396 and 1396a. Section 1396 permits each state to establish a medical assistance program (such as Medicaid) on behalf of families with dependent children and of aged, blind, or permanently and totally disabled individuals. Section 1396a provides that a state plan for medical assistance must provide for making medical assistance available to all persons receiving aid under the four categorical assistance programs. Plaintiffs point out that when the new regulation disqualifies members of the plaintiff classes from receiving aid from the categorical assistance programs it automatically disqualifies them from receiving Medicaid as well. This, they say, causes the new regulation to be invalid. While Congress specifically provided that those eligible for categorical assistance must be included in a state medical aid plan, it also permitted the states to make adjustments affecting, or even terminating, eligibility of some recipients for categorical assistance if such adjustments did not conflict with provisions of federal statutes or the Constitution. We are not able to say that the Congressional requirement that a state medical aid program include those receiving categorical assistance limited the power of the states to make otherwise valid changes in categorical assistance eligibility.

■ *Jefferson* also lays to rest plaintiffs' argument that the new regulations violate the Civil Rights Act of 1964, 42 U.S.C. § 2000d. 406 U.S. at 549–550 n. 19, 92 S.Ct. at 1733, 32 L.Ed.2d at 298 n. 19.

### 2. The constitutional claims

Plaintiffs' equal protection argument has two prongs. The first is that the new regulation was adopted for the purpose and had the effect of imposing the adverse consequences of a shortage of funds upon two programs with higher proportions of black recipients while leaving unaffected programs with higher proportions of whites. The second prong relates to the disparity between the reduction factors in effect for the various programs prior to and at the time the new regulation was adopted. As we have pointed out, these factors were 35% for Dependent Children and 58% for Disabled persons, the two black-majority programs, as against 100% for Old Age and Aid to Blind, the two allegedly majority-white programs. Plaintiffs claim that these disparities are racially discriminatory in purpose and effect.[12]

In the *Jefferson* case the plaintiffs claimed that Texas violated the equal

---

12. Par. 21 of the Complaint alleged in part: "Plaintiffs and their class are denied equal protection of the laws by the existing practice of paying grossly smaller percentages of need to recipients of APTD and ADC than are paid recipients of OA and Par. C of the request for relief asked: and AB."

"That Plaintiffs' class are denied equal protection by gross disparity between the level of benefits paid them and the recipients of OA; and that Title 49, § 17(26) (Recomp.1958) is unconstitutional as a violation of the equal protection clause."

protection clause by employing reduction factors which differed between the programs and were racially and ethnically discriminatory—75% for the Dependent Children program, where there was a larger percentage of Negroes and Mexican-Americans, as opposed to 100% for the aged and 95% for the disabled and the blind, in which whites predominated. The plaintiffs, however, failed in their proof. They were not able to prove racial or ethnic prejudice by state officials, and the three-judge court found that the disparate reduction factors were not shown to have resulted from ethnic or racial motives. There being insufficient proof of discrimination, the court concluded it should review the state's actions under the "traditional" equal protection standard, which requires that the action be invidious or irrational in order to violate equal protection, and declined to apply the more rigid standard requiring the state to show a compelling state interest to justify unequal treatment of citizens under some circumstances.[13]

On appeal to the Supreme Court the Texas plaintiffs did not claim that the findings of the District Court were in error. Rather they stood on statistics alone, that is, the figures showing differing racial compositions of the various programs and differing reduction factors. The Supreme Court agreed with the District Court that plaintiffs had failed to prove racial discrimination and that without such proof the "traditional" standard of review was appropriate. The court then applied that standard and concluded that given the racial heterogeneity of the nation's population and the right of the state to make distinctions between the various programs for reasons entirely valid, plaintiffs' "naked statistical argument" was not enough to establish that Texas had acted invidiously or irrationally.

In the hearing before us, conducted before the Supreme Court's final decision in *Jefferson*, the focus of attention of court and parties was upon the effect of the new regulation as demonstrated by the "naked statistics." All now know that such proof alone does not invalidate the state's actions, and that the issue of intent, upon which inquiry was not focused but upon which there was some evidence, is central to the case. Both in open court and in briefs plaintiffs stipulated that the intent of the defendants was not one of racial discrimination. Considered in context, the stipulation only reached the agreed fact that at the time the new regulation was adopted, and in the process of adopting it, the state officials acted for fiscal reasons. We do not construe it as embracing a concession that the disparate reduction factors, in existence prior to adoption of the new regulation, had been adopted free of discriminatory motive. Nor do we construe it as embracing a concession that at times prior to the adoption of the new regulation the acts and affairs of the Department had been uniformly free of racial motivations. With the guidelines in *Jefferson* now available, and with the parties aware of the interpretation which we place on the stipulation, all parties are entitled, before the court renders a decision on the racial discrimination point, to the opportunity of offering further evidence pertinent to the intent issue.

We find that plaintiffs were not denied procedural due process by the adoption and implementation of the new regulation without prior notice to them and an opportunity for fair hearing. Goldberg v. Kelly, *supra*, involved terminations of benefits pursuant to an agency's exercise of its adjudicative function to determine factual issues relevant to the eligibility of individual recipients.

13. See Dandridge v. Williams, 397 U.S. 471, 485 n. 17, 90 S.Ct. 1153, 25 L.Ed.2d 491, 502 n. 17 (1970), declining to apply the compelling state interest test but noting that there was no contention of such a racially discriminatory purpose or effect to a Maryland welfare regulation as to make it "inherently suspect."

The terminations which occurred in the instant case were produced by state-wide policy changes in welfare programs implemented pursuant to the agency's legislative rulemaking function. *Goldberg* does not compel prior notice and hearing under those circumstances. Merriweather v. Burson, 325 F.Supp. 709 (N.D.Ga. 1970), aff'd in part, remanded on another issue, 439 F.2d 1092 (C.A.5, 1971); Provost v. Betit, 326 F.Supp. 920 (D. Vt.1971); Rochester v. Ingram, 337 F. Supp. 350 (D.Del.1972). In Hunt v. Edmunds, 328 F.Supp. 468 (D.Minn.1971), relied upon by plaintiffs for the proposition that a hearing is required whatever the reason for the changes in benefits, a hearing was required because the underlying issues on which the agency's decision to reduce plaintiff's benefits was grounded were evidentiary issues relevant to her own individual eligibility, not policy questions concerning across-the-board or state-wide adjustments in benefits. The HEW regulation governing continuation of assistance pending a hearing on the question of reduction or termination of assistance, 45 C.F.R. § 205.10(a)(5)(iii)(a)(i), is not inconsistent with *Goldberg* but correctly implements the decision, since it reflects the distinction just discussed.

It is, therefore, ordered and decreed as follows:

1. The claim that the regulation of the Department of Pensions & Security, exemplified by Administrative Letter 2957, dated April 19, 1971, contravenes 42 U.S.C. § 602(a)(2), 42 U.S.C. § 602(a)(10), 42 U.S.C. §§ 1396 and 1396a, and 42 U.S.C. § 2000d is denied.

2. The claim that the said regulation violates procedural due process as guaranteed by the Fourteenth Amendment to the United States Constitution is denied.

3. All other questions are reserved.

4. The parties are allowed 45 days from date in which to secure and to present to the court additional evidence on the equal protection issue. Any testimony will be taken by deposition.